UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-22065-CIV-ALTONAGA/Goodman

INTERESTED LLOYDS
UNDERWRITERS,

  Plaintiff,

v.

DANZAS CORPORATION,

  Defendant.

_____/

## ORDER

**THIS CAUSE** came before the Court on Defendant, Danzas Corporation d/b/a DHL Global Forwarding's Motion for Summary Judgment [ECF No. 51], filed on November 3, 2020. Plaintiff, Interested Lloyds Underwriters, filed a Memorandum of Law in Opposition to Defendants [sic] Motion [ECF No. 55], to which Defendant filed a Reply [ECF No. 59]. The Court has carefully considered the [Second] Amended Complaint ("SAC") [ECF No. 31], the parties' submissions,[1] the record, and applicable law.

## I.   BACKGROUND

This action arises from an international shipping dispute. (*See generally* SAC). Plaintiff a group of foreign insurance underwriters located in London. (*See id.* ¶ 3). Defendant is an Ohio corporation with an office in Plantation, Florida. (*See id.* ¶ 4).

---

[1] The parties' factual submissions include Defendant's Rule 56.1 Statement of Undisputed Facts in Support of for [sic] Summary Judgment ("Def.'s Facts") [ECF No. 52] and supporting exhibits (*see* [ECF Nos. 52-1–52-3]); Plaintiff's Statement of Material Facts ("Pl.'s Facts") [ECF No. 54] and supporting exhibits (*see* [ECF Nos. 54-1–54-4]); and Defendant's Rule 56.1 Response to Plaintiff's Statement of Undisputed Facts ("Def.'s Resp. Facts") [ECF No. 60]. Plaintiff also filed a Notice of Filing Discovery in Opposition to the Defendant's Motion for Summary Judgment [ECF No. 53] with attached exhibits (*see id.* [ECF Nos. 53-1–53-18]).

*The Policy and Subrogation Agreement*.  Plaintiff issued a Cargo Insurance Policy Number B0595JY864018J ("Policy") listing as assureds Pegasus Parts Distribution LLC ("Pegasus"); Orion Supplies LLC; Commercial Blue South LTDA; Distribudora Dominicos; Reliable Parts Distributors; Partstek Distributors Ltd.; Specialty Sales Inc.; KB International Trading Corp.; Global Trading Partners Inc.; Paradigm Distributors Inc.; and/or associated or affiliated companies.  (*See* Pl.'s Facts ¶ 69; Policy [ECF No. 53-18] 2).[2]  According to Plaintiff, International Brand Development and Dynamix are two associated or affiliated companies insured under the Policy.  (*See* Pl.'s Facts ¶¶ 19, 70).  Defendant disputes that International Brand Development is an associated or affiliated company.  (*See* Def.'s Resp. Facts ¶ 70).

Plaintiff alleges the Policy insured Pegasus for an international shipment of a refrigerated container of 20 pallets and 2300 packages of Duke's Mayonnaise from Charleston, South Carolina to Chile.  (*See* SAC ¶ 5).  According to the SAC, the mayonnaise shipment was damaged when it was transported at a temperature of -18.3 degrees Celsius rather than 18.3 degrees Celsius, causing a total loss in the amount of $42,854.00 (*see id.* ¶¶ 6, 11, 19); and Pegasus made a claim against Plaintiff for that sum less a $5,000.00 deductible (*see id.* ¶ 6).  Having paid the claim, Plaintiff maintains it is subrogated to the rights of Pegasus.  (*See id.* ¶ 7; *see also id.*, Proof of Loss and Subrogation Agreement ("Subrogation Agreement") 8).

*The sale and transportation arrangements*.  International Brand Development, not Pegasus, in fact purchased the mayonnaise from the supplier, C.F. Sauer Company, and sold it to Hipermercados Tottus, S.A. ("Tottus") in Chile for $42,854.00.  (*See* Def.'s Facts ¶¶ 7, 51; Commercial Invoice [ECF No. 53-7]).  The goods were sold "on FOB terms[,]" meaning that "title

---

[2] The Court relies on the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

and risk of loss passed to Tottus when the shipment arrived at the port" in Charleston.[3]  (Def.'s Facts ¶¶ 7–8 (alteration added; emphasis omitted); *see also* Commercial Invoice).

Tottus retained Defendant to make the arrangements for the ocean transportation of the shipment.  (*See* Def.'s Facts ¶ 28).  Defendant, in turn, coordinated the ocean transportation with an ocean carrier, Maersk Line A/S d/b/a Sealand ("Sealand"), to transport the shipment.  (*See id.* ¶¶ 12, 16).  Tottus had a separate contract directly with Sealand for these services.  (*See id.* ¶ 25; Decl. of Jason Gorman ("Gorman Decl.") [ECF No. 52-2] ¶ 22).  As for the inland transportation of the shipment, Tottus requested that Dynamix arrange to transport the shipment from C.F. Sauer's facility in Greenville, South Carolina to the port in Charleston.  (*See* Pl.'s Facts ¶¶ 34–35; Gorman Decl. ¶ 9).

The parties have submitted email exchanges providing further detail about the discussions regarding the logistics.  In September 2018, Dynamix emailed Defendant to coordinate transportation of the shipment from Greenville, South Carolina to Chile (*see* Sept. 21–Oct. 4, 2018 Correspondence [ECF No. 53-11] 11), and noted the shipment was "to be moved under [Defendant's] contract with . . . Tottus (*id.* 6 (alterations added)).  On October 4, 2018, Dynamix advised Defendant that the temperature of the reefer should be set to 18.3 degrees Celsius.  (*See id.* 1; Pl.'s Facts ¶ 76).  That same day, Defendant emailed Sealand to book the ocean transportation, noting that the temperature for the shipment should be set to 18.3 degrees Celsius. (*See* Gorman Decl., Oct. 4, 2018 Correspondence 11–12).

---

[3] Defendant explains the Incoterms are rules published by the International Chamber of Commerce that set forth the terms of trade for the international sale of goods, and "FOB" (or "Free On Board") is an Incoterm that means "the seller delivers the goods on board the vessel nominated by the buyer at the named port of shipment or procures the goods already so delivered."  (Mot. 7 n.2 (quotation marks and citation omitted)). The term further provides "[t]he risk of loss of or damage to the goods passes when the goods are on board the vessel, and the buyer bears all costs from that moment onwards."  (*Id.* (alteration added; quotation marks and citations omitted)).

The next day, Defendant emailed Dynamix and Defendant's Chilean affiliate, DHL Global Forwarding (Chile) S.A. ("DGF Chile"), to confirm the booking. (*See* Oct. 5–Dec. 17, 2018 Correspondence [ECF No. 53-12] 28–30). On October 8, 2018, Dynamix asked Defendant to "coordinate drayage as well for us" and stated, "we will pay [Defendant] directly." (*Id.* 26 (alteration added)). Defendant responded it could not dispatch a trucker because Tottus did not have credit with Defendant. (*See id.* 25). Later, DGF Chile explained Tottus was using its contract with Sealand to pay for the shipment rather than a contract with Defendant, and "because this shipment is FOB then [the s]hipper must deliver the cargo until the Charleston [p]ort[.]" (*Id.* 20 (alterations added)). Dynamix then again instructed Defendant to coordinate drayage and charge Dynamix directly. (*See id.* 17, 19).

On October 18, 2018, Defendant issued a new booking confirmation for the shipment. (*See id.* 12–15). The next day, a Friday, Defendant told Dynamix "I think what we're going to do is dispatch a trucker, and then turn right around invoice you on the day of loading . . . (with no credit we basically have to charge you immediately?) I will have more information on that process on Monday, but it seems as though that is what we're going to do in order to get this done ASAP." (*Id.* 10 (alteration added)). On October 30, 2018, Defendant informed Dynamix that the shipment was "picked up and . . . ingated in Charleston" and noted Defendant would "work on th[e] invoice[.]" (*Id.* 8 (alterations added)). On November 5, 2018, Defendant stated it would send the invoice to Dynamix that afternoon. (*See id.* 5). The emails do not reveal whether an invoice was ever sent to Dynamix.[4]

---

[4] Relying on these email exchanges, Plaintiff states Defendant dispatched a trucker to pick up the container in Greenville and transport it to the port. (*See* Pl.'s Facts ¶ 77). Jason Gorman, Defendant's Ocean Freight Operations Manager (*see* Gorman Decl. ¶ 2), explains Defendant retained a trucker to pick up the container in Greenville but was unable to do so on Dynamix's behalf because Dynamix did not have a credit account with Defendant (*see id.* ¶¶ 10, 32). Instead, Defendant invoiced DGF Chile for the trucker along with the ocean freight charge, and DGF Chile in turn billed Tottus. (*See id.* ¶¶ 11–12, 14; *id.*, DHL Invoice 8).

*Defendant's terms and conditions*.  Virtually all emails sent by Defendant's representative to Dynamix and others noted the following: "All business transactions are based on DHL Global Forwarding terms and conditions, available upon request."  (*See generally* Sept. 21–Oct. 4, 2018 Correspondence; Oct. 5–Dec. 17, 2018 Correspondence; *see also* Def.'s Facts ¶ 33).  The parties agree their relationship is governed by Defendant's terms and conditions but dispute which set of terms and conditions applies.  (*See* Def.'s Facts ¶ 31; Pl.'s Facts ¶ 31).  Defendant provides a set of Terms and Conditions (*see* Gorman Decl., Terms and Conditions 9) purportedly attached to the invoice Defendant issued to DGF Chile.  (*See* Def.'s Facts ¶ 37).  Defendant states DGF Chile routinely receives invoices from Defendant along with the Terms and Conditions for services rendered by Defendant to DGF Chile on behalf of DGF Chile's customers, including Tottus.  (*See* Def.'s Facts ¶¶ 40–43).

Defendant's proffered Terms and Conditions provide:

2. Liability Limitations of Third Parties.  The Company is authorized to select and engage carriers, truckmen, lightermen, forwarders, customhouse brokers, agents, warehousemen and others, as required, to transport, store, deal with and deliver the goods, all of whom shall be considered as the agents of the Customer . . . .  The Company shall under no circumstances be liable for any loss, damage, expense or delay to the goods for any reason whatsoever when said goods are in custody, possession or control of third parties selected by the Company to forward, enter and clear, transport or render other services with respect to such goods.

. . . .

8. Limitation of $50 Per Shipment.  The Customer agrees that the Company shall in no event be liable for any loss, damage, expense or delay to the goods resulting from the negligence or other fault of the Company for any amount in excess of $50.00 per shipment (or the invoice value, if less) and any partial loss or damage for which the Company may be liable shall be adjusted pro rata on the basis of such valuation.

. . . .

---

Plaintiff does not dispute Defendant invoiced DGF Chile but "dispute[s] the services provided under that invoice."  (Pl.'s Facts ¶ 36 (alteration added)).

20. Construction of Terms and Venue.  The foregoing terms and conditions shall be construed according to the laws of the State of Florida.  Unless otherwise consented to in writing by the Company, no legal proceeding against the Company may be instituted by the Customer, its assigns, or subrogee except in the City of Miami, Florida, U.S.A.

(Gorman Decl., Terms and Conditions 9 (alterations added; bold omitted)).  "Company" refers to Defendant, and "Customer" is defined as "includ[ing] the exporter, importer, sender, receiver, owner, consignor, consignee, transferer or transferee of the shipments[.]"  (*Id.* (alterations added)).

Plaintiff disagrees that these Terms and Conditions were contained in the invoice to DGF Chile, pointing out that the invoice is "page 1 of 1" and states "[a]ll and any business undertaken, including any advice, information or service provided, whether gratuitously or not is transacted subject to the standard conditions for the time being in force, a copy of which will be supplied on request."  (Pl.'s Facts ¶ 37 (alteration added); *see also* Gorman Decl., DHL Invoice 8).  Further, Plaintiff disputes that the Terms and Conditions apply to the subject transaction, offering four other documents that potentially apply.  (*See* Pl.'s Facts ¶¶ 29–31, 94–97).  The Court briefly describes them:

- First, the DHL Global Forwarding Terms & Conditions [ECF No. 54-1].  This document notes the terms and conditions are valid as of October 11, 2019 and does not contain a liability limitation provision or a forum selection clause.  (*See generally id.*).

- Second, the Danmar Lines Bill of Lading Terms and Conditions [ECF No. 54-2].  Danmar Lines is Defendant's in-house carrier.  (*See* Reply 8).  Plaintiff's proffered document is illegible, and the undersigned cannot make out its terms.  (*See generally* Danmar Lines Bill of Lading Terms and Conditions; *see also* Def.'s Resp. Facts ¶ 95 ("The record referenced is incredibly blurry and unintelligible.")).

- Third, the DHL Global Forwarding Standard Trading Conditions [ECF No. 54-3].  These limit Defendant's liability for negligence, but the limitation is different from the $50 limitation contained in Defendant's Terms and Conditions.  (*See id.* 4 ("[T]he Company shall be liable for losses of or damage to the Goods which occurs due to the Company's negligence . . . while the Goods are in the Company's care, custody and control, such liability not to exceed a sum at the rate of two SDRs per kilo of gross weight of any Goods lost or damaged . . . ." (alterations added))).  The DHL Global Forwarding Standard Trading Conditions are governed "by the laws of the country where the DGF entity which

issued the invoice is based and the courts of such country will have exclusive jurisdiction." (*Id.* 3).

- Finally, the DHL Global Forwarding Terms and Conditions of U.S. Domestic Carriage [ECF No. 54-4]. These "apply only to any shipment that originates in, is destined for, and does not include an ultimate destination or stop outside of, the United States or any U.S. territory, possession, or commonwealth . . . ." (*Id.* 2 (alteration added; emphasis and capitalization omitted)).  They contain a $50-per-shipment liability limitation in the case of negligence (*see id.* 5) and provide that "any claim or dispute arising from or in connection with this agreement, shall be governed by the laws of Florida except to the extent preempted by federal laws, and shall be brought exclusively in the state or federal courts serving the state of Florida" (*id.* 7 (capitalization omitted)).

***The shipment's journey and the temperature error***.  The mayonnaise was loaded into a refrigerated container by C.F. Sauer; Plaintiff and its insureds and subrogors did not witness the loading of the shipment.  (*See* Def.'s Facts ¶¶ 57–58).  Defendant asserts it was not involved in the loading of the mayonnaise into the container, nor did it direct the trucker it retained to bring an empty container to C.F. Sauer's facility or maintain the container at any temperature; and presumably, C.F. Sauer or Dynamix ordered an empty container to be delivered to C.F. Sauer's facility.  (*See* Def.'s Facts ¶¶ 53–55; Gorman Decl. ¶¶ 33–36).  Plaintiff disagrees, stating that Defendant arranged for the refrigerated container and for the trucker to pick up the shipment.  (*See* Pl.'s Facts ¶¶ 53–55).

The container was picked up and ingated at the port in Charleston on October 30, 2018. (*See* Def.'s Facts ¶ 66; Pl.'s Facts ¶ 81).  Upon arrival at the port, the container was received and weighed by the South Carolina State Ports Authority.  (*See* Def.'s Facts ¶ 63).  The Ports Authority issued a Carrier Interchange ticket noting the temperature of the container to be -18.3 degrees Celsius.  (*See id.* ¶¶ 64–65; Gorman Decl., Carrier Interchange Reprint 18).  On November 3, 2018, the container was shipped on board Sealand's vessel.  (*See* Pl.'s Facts ¶ 82).

Sealand, not Defendant, issued the Bill of Lading [ECF No. 53-14] for the shipment.  (*See* Def.'s Facts ¶¶ 15, 17).  The Bill of Lading identifies International Brand Development as the

CASE NO. 20-22065-CIV-ALTONAGA/Goodman

"Shipper[,]" Tottus as the "Consignee[,]" and Defendant as the "Forwarder[.]"  (Bill of Lading 1 (alterations added); *see also* Def.'s Facts ¶ 18).  The Bill of Lading indicates the temperature of the container was -18.3 degrees Celsius.  (*See* Bill of Lading 1; *see also* Pl.'s Facts ¶ 75).

On November 5, 2018, Dynamix requested a copy of the Sealand Bill of Lading from Defendant, which was provided that same day.  (*See* Pl.'s Facts ¶¶ 83–84; Def.'s Resp. Facts ¶ 84).  As stated, the Bill of Lading showed an incorrect temperature setting of -18.3 degrees Celsius.  (*See* Pl.'s Facts ¶¶ 75, 85; Bill of Lading 1).  The next day, Dynamix advised Defendant of the mistake and stated that the product could be in jeopardy if the temperature had in fact been set to -18.3 degrees.  (*See* Pl.'s Facts ¶¶ 85–87; Def.'s Resp. Facts ¶ 86).  Defendant said it confirmed with Sealand that the booking noted the correct temperature, and Defendant provided Dynamix a copy of a Corrected Bill of Lading [ECF No. 53-13] showing a temperature setting of 18.3 degrees Celsius on November 8, 2018.  (*See* Oct. 5–Dec. 17, 2018 Correspondence 1–3; Pl's Facts ¶ 88).

Plaintiff claims the container was still shipped at the wrong temperature and the mayonnaise was damaged, constituting a total loss.  (*See* Pl.'s Facts ¶ 91).  On December 17, 2018, Dynamix emailed Defendant, stating:

> [O]ur customer . . . advis[ed] the product . . . was received liquified possibly due to a drop in temperature inside the container.  I don't know if this has anything to do with the typo from the original [Bill of Lading] or an incident during transit but if the container was indeed received in -20C, but the product is completely ruined as per our customer's email.
>
> Can you please confirm with Sealand if they can provide you with the temp recorder history of the container[?]

(Oct. 5–Dec. 17, 2018 Correspondence 1 (alterations added)).  According to Plaintiff, Defendant "would have access to the temperature recorder and has not provided [it]."  (Pl.'s Facts ¶ 56 (alteration added)).

Defendant maintains it was Sealand's responsibility to ensure the Bill of Lading was accurate, and Sealand erred when it issued a Bill of Lading showing the incorrect temperature setting and failed to correct it.  (*See* Def.'s Facts ¶¶ 22–24).  Plaintiff disagrees, stating Defendant erroneously advised Sealand that the reefer should be shipped at -18.3 degrees Celsius.  (*See* Pl.'s Facts ¶ 22).

*Procedural history*.  The Southern District of New York transferred the case to this District on May 18, 2020.  (*See* [ECF No. 22]).  Prior to transfer, Plaintiff filed an Amended Complaint [ECF No. 7] on March 4, 2020, asserting apparently one claim under the Carriage of Goods by Sea Act ("COGSA") for damages for the destroyed cargo.  (*See generally id.*).  Plaintiff alleged venue was proper in the Southern District of New York "pursuant to the Defendant's Forum Selection Clause contained in the Terms and Conditions which specifies the United States District Court for the Southern District of New York as the exclusive forum."  (*Id.* ¶ 2).

Defendant challenged venue because Plaintiff did not allege a connection to New York or attach the Terms and Conditions to the Amended Complaint, and Defendant argued the case should be dismissed for improper venue or transferred to the Southern District of Florida because Defendant resides here and the Bill of Lading was issued in Miami.  (*See* Def.'s Mem. of Law In Supp. of Its Mot. to Dismiss [ECF No. 16] 5–6).  Plaintiff consented to transfer the case to the Southern District of Florida.  (*See* Pre-Conference Statement [ECF No. 20] 1; Memo Endorsement [ECF No. 21] 1).

After the case was transferred, Plaintiff filed its SAC on May 22, 2020 under 28 U.S.C. sections 1331 and 1337 and the COGSA.  (*See* SAC ¶ 1).  Plaintiff alleges venue is proper in this District "pursuant to the Defendant's Forum Selection Clause" and because "some of the acts giving rise to the lawsuit occurred here."  (*Id.* ¶ 2).  Plaintiff asserts two claims on behalf of

Pegasus, its subrogor.  Count I is titled "Common Carrier" and alleges "[a]s a direct and proximate result of [Defendant's] breach of its duties as a common carrier Pegasus was damaged in the amount of $42,854.00."  (*Id.* 3, ¶ 12 (alterations added; bold omitted)).  Count II is titled "Freight Forwarder" and alleges Defendant, "[b]y agreeing to arrange for the transportation and delivery of the shipment[,] . . . became liable as a freight forwarder for any loss or damage to the goods due to its negligence[;]" and "the cargo was destroyed" when "the refrigerated container was [] shipped at the wrong temperature setting . . . due to the negligence of the Defendant[.]"  (*Id.* 4, ¶¶ 17, 20– 21 (alterations added; bold omitted)).  Defendant moves for summary judgment on both claims. (*See generally* Mot.).

## II.    LEGAL STANDARD

Summary judgment may only be rendered if the pleadings, discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a), (c).  An issue of fact is "material" if it might affect the outcome of the case under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party.  *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court draws all reasonable inferences in favor of the party opposing summary judgment.  *See Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000).

If the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment simply by: (1) establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim, and (2) showing the court there is insufficient evidence to support the non-moving party's case.  *See Blackhawk Yachting, LLC v.*

*Tognum Am., Inc.*, No. 12-14209-Civ, 2015 WL 11176299, at *2 (S.D. Fla. June 30, 2015) (citations omitted). "Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must cite to . . . materials in the record or show that the materials cited do not establish the absence or presence of a genuine dispute." *Id.* (citing Fed. R. Civ. P. 56(c)(1); alteration added; quotation marks omitted).

"Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts." *Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-cv-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citation omitted). Indeed, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment" and proceed to trial. *Id.* (alteration added; citations omitted).

## III. DISCUSSION

Defendant argues (1) Plaintiff's subrogor(s) did not have title or risk of loss for the subject shipment; (2) Defendant acted at all times as an ocean freight forwarder, not an ocean carrier; (3) Defendant properly discharged its duties as a freight forwarder by providing the correct temperature instructions to Sealand, the ocean carrier; (4) Defendant's liability is limited to $50 in any event under its Terms and Conditions; and (5) Plaintiff, as subrogee, lacks standing to bring its claims. (*See generally* Mot.).

### A. Standing

The Court addresses Defendant's first and fifth arguments together. Defendant argues Pegasus, the named subrogor in the SAC, did not purchase or sell the mayonnaise or retain Defendant to provide any services, and so Plaintiff lacks standing as subrogee to assert claims for damages. (*See* Mot. 15–17; Reply 3).

"A subrogee acquires standing to sue through subrogation." *Am. Coastal Ins. Co. v. Electrolux Home Prod., Inc.*, No. 2:19-cv-180, 2019 WL 5068577, at *2 (M.D. Fla. Oct. 9, 2019) (citing *Dixie Nat'l Bank of Dade Cnty. v. Emp'rs Commercial Union Ins. Co. of Am.*, 463 So. 2d 1147, 1151 (Fla. 1985)).  "[S]ubrogation entails 'the substitution of one person in the place of another with reference to a lawful claim or right.'"  *Zurich Am. Ins. Co. v. S.-Owners Ins. Co.*, 248 F. Supp. 3d 1268, 1286 (M.D. Fla. 2017) (alteration added; quoting *W. Am. Ins. Co. v. Yellow Cab Co. of Orlando*, 495 So. 2d 204, 206 (Fla. 5th DCA 1986)).  In other words, "the subrogee 'stands in the shoes' of the subrogor and is entitled to all of the rights of its subrogor."  *N. Ins. Co. of New York v. Pelican Point Harbor, Inc.*, No. 3:05cv184, 2006 WL 1285078, at *8 n.9 (N.D. Fla. May 5, 2006) (citing *Klonis for Use & Benefit of Consol. Am. Ins. Co. v. Armstrong*, 436 So. 2d 213 (Fla. 1st DCA 1983)).

"Florida recognizes two types of subrogation: conventional and equitable."  *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. KPMG Peat Marwick*, 742 So. 2d 328, 332 (Fla. 3d DCA 1999). Pertinent here, "[c]onventional subrogation is based on an agreement between the parties that the party paying the debt will be subrogated to the rights of the original creditor" and "arises when a party 'having no interest in or relation to the matter pays the debt of another, and by agreement is entitled to the securities and rights of the creditor so paid.'"  *Id.* (alteration added; quoting *E. Nat'l Bank v. Glendale Fed. Sav. & Loan Ass'n*, 508 So. 2d 1323, 1325 (Fla. 3d DCA 1987)).  "In the insurance context, the insurer is 'put in the position of the insured in order to pursue recovery from third parties legally responsible to the insured for a loss paid by the insurer.'"  *Zurich Am. Ins. Co.*, 248 F. Supp. 3d at 1286–87 (quoting *Monte de Oca v. State Farm Fire & Cas. Co.*, 897 So. 2d 471, 472 n.2 (Fla. 3d DCA 2004)).

The Policy that insured the shipment of mayonnaise lists as assureds Pegasus, several enumerated companies, and other "associated and/or affiliated companies."  (Policy 2).  The Subrogation Agreement contains information about the shipment, identifying International Brand Development as the shipper, and states the net loss (the selling price — $42,854.00 — less the $5,000.00 deductible) is $37,854.00.  (*See* SAC, Subrogation Agreement 8).  It lists as assureds Pegasus and "affiliated companies" and provides "[t]he insured(s) hereby assign(s), transfer(s), and set(s) over to the insurance company any and all claims or causes of action of whatsoever kind and nature, held now and hereafter by the policyholder(s), to recover against any person(s) or entity(ies) [sic] as the result of the loss described above to the extent of the payment(s) made by the insurance company."  (*Id.* (alteration added)).

The parties appear to dispute whether International Brand Development, the shipper, is an "affiliated company" under the Policy and Subrogation Agreement and received payment from Plaintiff for the loss, and thus whether Plaintiff is subrogated to the rights of International Brand Development with regard to the mayonnaise shipment.  (*Compare* Pl.'s Facts ¶ 70; Opp'n 5–6, *with* Def.'s Resp. Facts ¶ 70; Reply 1, 3).  Defendant does not otherwise challenge the applicability of the Subrogation Agreement.  (*See generally* Mot.; Reply).  Consequently, summary judgment is improper on this ground.

Defendant contends that even if International Brand Development were an affiliated company, it would not have standing to confer on Plaintiff because title and risk of loss passed to Tottus for the ocean portion of the transportation under the sale's FOB terms.  (*See* Mot. 7–8, 16–17; Reply 2).  Certainly, "[a]n action must be prosecuted in the name of the real party in interest."  Fed. R. Civ. P. 17(a)(1) (alteration added).  To support its position that International Brand Development was not the real party in interest because it did not bear the risk of loss, Defendant

cites three cases: *Cornucopia Cruise Line, Inc. v. Cummings Marine, Inc.*, No. 08-02864, 2012 WL 786836 (W.D. Tenn. Mar. 7, 2012), *IM EX Trading Co. v. Vessel, BEATE OLDENDORFF*, 841 F. Supp. 1151 (M.D. Fla. 1993), and *Alaska Russia Salmon Caviar Co. v. M/V "MARIT MAERSK"*, No. 98 Civ. 7685, 2000 WL 145124 (S.D.N.Y. Feb. 2, 2000).  (*See* Mot. 16–17).  These cases are inapposite.

*Cornucopia Cruise Line* did not concern standing; the court found the defendant bailee would not owe the plaintiff vessel owner a duty of care under the parties' contract if the damage to the vessel occurred before title passed to the plaintiff from the previous owner, but the court denied summary judgment because the record did not clearly show when the vessel was damaged.  *See* 2012 WL 786836, at *6–8.  And in *IM EX Trading* and *Alaska Russia Salmon Caviar*, the courts concluded the shippers lacked standing where they sued for damage to goods under contracts that shifted title and risk of loss to the buyers.  *See* 841 F. Supp. at 1152–53 (finding no standing to sue for damage to a shipment of pears where title and risk passed to the consignee under the terms of the bill of lading); 2000 WL 145124, at *4 (finding no standing to sue for lost shipment of salmon roe under sales contract on CIF terms, meaning that title and risk of loss passed to the buyer upon delivery of the goods to the carrier).

Here, as discussed in further detail below, Plaintiff's only remaining claim is a negligence claim against Defendant for breach of its duties as a freight forwarder.  This claim does not rely on the sales contract between International Brand Development and Tottus (*see* Commercial Invoice) or on the Bill of Lading issued by Sealand.  Defendant does not offer any other legal authority demonstrating that the FOB terms of the sale of mayonnaise mean Plaintiff does not have standing to pursue its negligence claim.  Because Plaintiff has shown, for purposes of summary judgment, that it is subrogated to the rights of its insureds (including International Brand

Development), Plaintiff is the real party in interest in this action. *See Frank Briscoe Co. v. Ga. Sprinkler Co.*, 713 F.2d 1500, 1502 n.1 (11th Cir. 1983) ("Where an insurance company as subrogee has paid an entire loss suffered by the insured it is the only real party in interest and must sue in its own name." (citation omitted)).

In short, Defendant fails to persuade Plaintiff lacks standing based on its subrogee status or the shifting title and risk of loss.

**B.  Defendant's Liability as a Carrier**

Defendant asserts it acted at all times as an ocean freight forwarder — not as an ocean carrier under the COGSA — and therefore is entitled to judgment as a matter of law on Count I. (*See* Mot. 8–10).

"Enacted in 1936, [the] COGSA governs all foreign trade contracts for the carriage of goods by sea to or from U.S. ports." *Underwriters at Interest Under Bailee Ins. Policy No. 09RTAMIA1158 v. SeaTruck, Inc.*, 858 F. Supp. 2d 1334, 1337 (S.D. Fla. 2012) (alteration added; citing 46 U.S.C. § 30701). "The purpose of [the] COGSA was to achieve international uniformity and to redress the edge in bargaining power enjoyed by carriers over shipper and cargo interests by setting out certain duties and responsibilities of carriers that cannot be avoided even by express contractual provision." *Polo Ralph Lauren, L.P. v. Tropical Shipping & Constr. Co.*, 215 F.3d 1217, 1220 (11th Cir. 2000) (alteration added; quotation marks and citation omitted).

"There is a 'well settled legal distinction between forwarders and carriers[.]'" *ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.*, 253 F. Supp. 2d 757, 764 (S.D.N.Y. 2003) (alteration added; citation omitted). A "carrier" under the COGSA "means the owner, manager, charterer, agent, or master of a vessel." 46 U.S.C. § 30701 (quotation marks omitted). A carrier

"does not merely arrange for transportation of goods, but takes on the responsibility of delivering the goods." *Scholastic Inc. v. M/V KITANO*, 362 F. Supp. 2d 449, 455 (S.D.N.Y. 2005).

> In contrast, a freight forwarder
>
> simply facilitates the movement of cargo to the ocean vessel.  The freight forwarder: secures cargo space with a steamship company, gives advice on governmental licensing requirements, proper port of exit and letter of credit intricacies, and arranges to have the cargo reach the seaboard in time to meet the designated vessel.  Freight forwarders generally make arrangements for the movement of cargo at the request of clients and are vitally different from carriers, such as vessels, truckers, stevedores or warehouses, which are directly involved in transporting the cargo.

*Prima U.S. Inc. v. Panalpina, Inc.*, 223 F.3d 126, 129 (2d Cir. 2000) (alterations adopted; citations omitted).

"The most fundamental difference between a freight forwarder and [a carrier] is that [a carrier] issues a bill of lading." *Scholastic Inc.*, 362 F. Supp. 2d at 455 (alterations added; citation omitted).  "Unlike a carrier, a freight forwarder does *not* issue a bill of lading, and is therefore not liable to a shipper for anything that occurs to the goods being shipped." *Prima U.S. Inc.*, 223 F.3d at 129 (alteration added; citing *United States v. Am. Union Transp.*, 327 U.S. 437, 442–43 (1946)); *see also Scholastic Inc.*, 362 F. Supp. 2d at 455–56 ("It is from the bill of lading — the [carrier's] contract with the shipper — that its liability to the shipper for its cargo derives." (alterations added; citing *Prima U.S. Inc.*, 223 F.3d at 129)).  "As long as the freight forwarder limits its role to arranging for transportation, it will not be held liable to the shipper." *Prima U.S. Inc.*, 223 F.3d at 129 (citations omitted).

"Of course a party that calls itself a freight forwarder might in fact be performing the functions of a carrier, in which case function would govern over form.  But the burden of demonstrating any deviation from what freight forwarders normally do in the maritime context must rest, and heavily so, on the party who would show such deviation." *Id.* at 130 n.1 (citation

omitted).  Under the approach set forth in *Zima Corporation v. M.V. Roman Pazinski*, 493 F. Supp. 268 (S.D.N.Y. 1980), "a party may be determined to be a carrier through a four-factor test: (1) how the party's obligation is expressed in documents pertaining to the agreement; (2) the history of dealings between the parties; (3) whether the party issued a bill of lading; and (4) how the party charged the shipper."  *Dimond Rigging Co., LLC v. BDP Int'l, Inc.*, 914 F.3d 435, 445 n.13 (6th Cir. 2019) (citing *Zima Corp.*, 493 F. Supp. at 273; other citation omitted).

Defendant is not a carrier under the COGSA's plain language.  *See id.* (noting the court in a previous case "focused on the language of the statute instead of a multi-factor test"); *Sabah Shipyard Sdn. Bhd. v. M/V Harbel Tapper*, 178 F.3d 400, 405 n.2 (5th Cir. 1999) (stating the court had "yet to apply anything resembling the *Zima* test, opting instead to follow the plain language of [the] COGSA" (alteration added; citation omitted)).  It is undisputed Sealand owned the vessel on which the container of mayonnaise was shipped.  (*See* Pl.'s Facts ¶ 82).  There is no indication Defendant was the "owner, manager, charterer, agent, or master of" that vessel.  46 U.S.C. § 30701.

Nor is Defendant a carrier under the *Zima* test.  Defendant was retained by Tottus to make arrangements for the ocean transportation of the shipment.  (*See* Def.'s Facts ¶ 28).  Defendant contracted with Sealand to transport the shipment (*see id.* ¶¶ 12, 16), and Tottus had a separate contract with Sealand for these services (*see id.* ¶ 25).[5]  Sealand, not Defendant, issued the Bill of Lading (*see id.* ¶¶ 15, 17; *see generally* Bill of Lading) and shipped the container of mayonnaise aboard its vessel (*see* Pl.'s Facts ¶ 82).  The Bill of Lading identified Defendant as the forwarder.  (*See* Bill of Lading 1).  Finally, Plaintiff does not suggest Defendant consolidated cargo or was involved with the ocean shipment of the refrigerated container.

---

[5] Although Tottus (the consignee) rather than International Brand Development (the shipper) contracted with Defendant and Sealand for the transportation of the goods, that fact does not appear to affect the conclusion that Defendant acted as a freight forwarder.

Based on these undisputed facts, the Court concludes Defendant acted as a freight forwarder, not a carrier. *See Ltd. Brands, Inc. v. UTI U.S., Inc.*, No. 2:03-cv-1268, 2005 WL 1629777, at *3 (S.D. Ohio July 8, 2005) (finding the defendant was a freight forwarder because it was hired by the plaintiff's affiliate to arrange for transportation of merchandise, did not issue a bill of lading, and did not consolidate cargo); *Randy Int'l, Ltd. v. Am. Excess Corp.*, 501 So. 2d 667, 670 (Fla. 3d DCA 1987) (finding the defendant was a freight forwarder under the *Zima* factors where the bill of lading provided by the carrier designated the defendant as the forwarding agent and the record was "devoid of competent substantial evidence of unusual dealings between the parties, or fee arrangements inconsistent with [the defendant's] position" (alteration added)). Defendant therefore cannot be liable to Plaintiff as an ocean carrier under the COGSA. *See Prima U.S. Inc.*, 223 F.3d at 129 (stating a forwarder that does not issue a bill of lading and "limits its role to arranging for transportation" will not be held liable to the shipper for anything that happens to the shipment (citations omitted)).

Plaintiff appears to concede Defendant did not act as an ocean carrier but insists Defendant breached its duties as a "domestic land carrier." (Opp'n 10 (bold omitted)). Plaintiff explains there are genuine issues of fact regarding whether Defendant transported the container of mayonnaise from the supplier in Greenville, South Carolina to the port in Charleston. (*See id.*). Defendant points out this claim was not raised in the SAC and contends it would not be subject to the Court's jurisdiction in any event because it concerns inland transportation. (*See* Reply 6–8).

Defendant has the stronger position. Count I alleges breach of carrier duties under the COGSA. (*See* SAC ¶ 12; *see also id.* ¶ 1 ("This is an action for damages in excess of $10,000.00 and otherwise within the jurisdiction of this Court because this case arises out of the [COGSA.] This Court has jurisdiction pursuant to 28 U.S.C. [sections] 1331 and 1337 in that it arises out of

issues of interstate/international commerce under the laws or treaties of [the] United States with an amount in dispute exceeding $10,000.00 exclusive of interest and costs." (alterations added))). "By default, [the] COGSA applies only from the time cargo is loaded onto a carrier's vessel until it is discharged." *SeaTruck, Inc.*, 858 F. Supp. 2d at 1337 (alteration added; citing 46 U.S.C. § 30701 and *Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co.*, 172 F.3d 781, 785 n.6 (11th Cir. 1999); other citation omitted); *see also Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 29 (2004) ("By its terms, [the] COGSA governs bills of lading for the carriage of goods from the time when the goods are loaded on to the time when they are discharged from the ship." (alteration added; quotation marks and citation omitted)).

While parties to a contract may "agree to apply [the] COGSA to other periods of transit by so indicating in the bill of lading[,]" *Miami Warehouse Logistics, Inc. v. Seaboard Marine Ltd.*, No. 16-25343-Civ, 2018 WL 1093592, at *2 (S.D. Fla. Jan. 16, 2018) (alterations added; citation omitted), there is no indication the parties here have done so.  (*See generally* Bill of Lading).  And Plaintiff has cited no authority demonstrating the COGSA applies to carriers' duties outside the ocean portion of the transportation.  (*See* Opp'n 10).  Consequently, Plaintiff cannot sustain a COGSA claim against Defendant as a carrier arising from the inland portion of the transportation.

In sum, Count I for breach of COGSA carrier duties fails as a matter of law.

### C.  Defendant's Liability as a Freight Forwarder

Defendant argues it is entitled to summary judgment on Count II alleging Defendant is liable for the damaged goods as a freight forwarder.  (*See* Mot. 10–11).

 In contrast to a carrier's liability, "[a] freight forwarder's liability to a shipper is limited to liability for negligence in supervising the transport of cargo." *Scholastic Inc.*, 362 F. Supp. 2d at 458 (alteration added; citing 1 Thomas J. Shoenbaum, Admiralty & Mar. Law § 10-7 (4th ed.);

other citation omitted); *see also Shonac Corp. v. Maersk, Inc.*, 159 F. Supp. 2d 1020, 1025 (S.D. Ohio 2001) ("[A] freight forwarder is liable for lost goods only if its own negligence (including negligence in hiring a carrier) caused the loss." (alteration added; citation omitted)). To prove negligence, a plaintiff must show that "(1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm."[6] *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336 (11th Cir. 2012) (citations omitted).

Defendant contends it was not retained by Plaintiff's subrogors and therefore owed them no duty; and Plaintiff has not provided any evidence demonstrating Defendant was negligent by conveying the wrong temperature to Sealand. (*See* Mot. 10–11). According to Plaintiff, there are genuine disputes of material fact as to whether Defendant breached its duties as a freight forwarder to arrange for and supervise the transport of the cargo and prepare the relevant shipping documents by providing incorrect instructions to Sealand regarding the reefer's temperature and failing to correct the error. (*See* Opp'n 11–12).

In its Reply, Defendant appears to concede it owed duties to Plaintiff as a freight forwarder, instead emphasizing that it did not breach these duties. (*See* Reply 4–5 (restating "the

---

[6] Defendant argues the Court has no federal question jurisdiction over claims for damage that occurred before the container was loaded onto the vessel because the COGSA does not apply to inland transportation. (*See* Mot. 7, 16–18; Reply 3). As explained, Defendant's position is generally correct. Yet, Plaintiff's negligence claim against Defendant as a freight forwarder does not arise under the COGSA. *See Salis v. Am. Exp. Lines*, 331 F. App'x 811, 814 (2d Cir. 2009) ("[The] COGSA does not apply to a freight forwarder such as [the defendant.]" (alterations added; citing *Prima U.S. Inc.*, 223 F.3d at 129–30)). Instead, "[f]ederal courts have traditionally exercised admiralty jurisdiction over shipper's [sic] claims against freight forwarders." *Ingersoll Mill. Mach. Co. v. M/V Bodena*, 619 F. Supp. 493, 503 (S.D.N.Y. 1985) (alteration added; collecting cases); *see also Int'l Cargo & Sur. Ins. Co. v. United States*, No. 91-c-5988, 1992 WL 332313, at *2 (N.D. Ill. Nov. 9, 1992) ("Because this is a dispute involving the carriage of goods in maritime commerce, admiralty law applies." (citing *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986)). In any event, as described in further detail below, it is unclear from the record whether the damage occurred before or after loading onto the vessel. Nonetheless, the Court will require the parties to clarify the basis for the Court's jurisdiction over Plaintiff's negligence claim in their pre-trial submissions.

responsibilities of a freight forwarder" as described by Plaintiff and asserting Defendant "performed its duties as a freight forwarder")); *see also Lambeth v. Three Lakes Corp.*, No. 1:19-cv-02602, 2020 WL 6018708, at \*5 n.7 (N.D. Ga. Aug. 10, 2020) (finding, on summary judgment, that the defendant conceded an issue where it did not respond to the plaintiffs' arguments on that issue (collecting cases)).

Many material facts are disputed, preventing the Court from determining by summary judgment whether Defendant was negligent. Defendant maintains "Plaintiff cannot controvert the fact that [Defendant] clearly instructed Sealand that the container was to be maintained at 18 degrees Celsius rather than –18 degrees." (Reply 5 (alteration added); *see also* Def.'s Facts ¶ 21). Defendant offers the October 4, 2018 email from Defendant to Sealand booking the transportation under booking number 578945069 and providing the correct temperature instruction. (*See* Gorman Decl., Oct. 4, 2018 Correspondence 11–12). Defendant states this is the booking number of the shipment as reflected in the Bill of Lading. (*See* Reply 5 n.1; *see also* Bill of Lading 1).

Plaintiff disagrees that Defendant provided the correct temperature instruction, stating Defendant erroneously advised Sealand the reefer should be shipped at -18.3 degrees Celsius (*see* Pl.'s Facts ¶ 22), and asserts Defendant's proffered email "appears to be for a different booking requested on October 4, 2018" while "the subject [] shipment was booked under a new and separate booking on October 18, 2018" (*id.* ¶ 21 (alterations added)). Plaintiff points to the email exchange between Dynamix and Defendant discussing, between October 16 and October 18, 2018, a new booking confirmation for booking number 578945069, which was issued on October 18. (*See* Oct. 5–Dec. 17, 2018 Correspondence 12–16). Viewed in the light most favorable to Plaintiff, the October 18, 2018 booking for the shipment supports a reasonable inference that Defendant

potentially mis-instructed Sealand about the container's temperature, even though it had previously conveyed the correct temperature.

The parties also dispute whether Defendant took appropriate steps to correct the temperature issue. Although the container arrived at the port on October 30, 2018 (*see* Def.'s Facts ¶ 66; Pl.'s Facts ¶ 81), it was not shipped until November 3, 2018 (*see* Pl.'s Facts ¶ 82). According to Plaintiff, Defendant was aware that the reefer was set to -18.3 degrees from the time it received the October 30, 2018 Carrier Exchange ticket but did not contact Sealand to correct the Bill of Lading until November 8, 2018, after Dynamix advised Defendant of the error on November 6, 2018. (*See* Pl.'s Facts ¶¶ 92–93). Defendant maintains the record does not support Plaintiff's facts and the parties' emails instead reveal that Defendant did reach out to Sealand about the error. (*See* Def.'s Resp. Facts ¶¶ 92–93).

The parties dispute which entity provided the refrigerated container. Defendant asserts the shipment was already loaded into the container when it was picked up by the trucker and presumes C.F. Sauer or Dynamix provided the container. (*See* Reply 7; Def.'s Facts ¶¶ 53–55; Gorman Decl. ¶¶ 33–36). Plaintiff, relying on Defendant's emails, maintains Defendant arranged for the refrigerated container and for the trucker to transport the shipment from Greenville to Charleston. (*See* Pl.'s Facts ¶¶ 53–55). Although Defendant insists that Plaintiff "attempts to mislead the Court" because its cited emails "refer to the <u>ocean</u> booking that [Defendant] made with Sealand" (Reply 7 (alteration added; original emphasis)), those emails, viewed in the light most favorable to Plaintiff, nonetheless raise a factual issue regarding whether Defendant provided the refrigerated container and/or instructed Sealand to do so.

Finally, the record does not clearly demonstrate when during the voyage the damage occurred. Plaintiff states "[t]here was no way to prove exactly where the damage happened

because [Defendant] had the temperature logs and for some reason they did not want to provide

the temperature logs."  (Opp'n 9 (alterations added); *see also* Pl.'s Facts ¶ 56 ("[Defendant] would

have access to the temperature recorder and has not provided same." (alteration added)); Oct. 5–

Dec. 17, 2018 Correspondence 1 (requesting temperature logs for the container on December 17,

2018)).

Thus, Plaintiff has presented evidence sufficient to create a genuine dispute of fact for its

negligence claim.  Defendant is not entitled to summary judgment on Count II.

### D.  Liability Limitation

Defendant asserts its liability is limited to $50 in any event in accordance with the Terms

and Conditions attached to the invoice issued by Defendant to DGF Chile.  (*See* Mot. 11–14).

As stated, it is undisputed that the parties' relationship is governed by Defendant's terms

and conditions.  (*See* Def.'s Facts ¶ 31; Pl.'s Facts ¶ 31).  Notably, the email communications

between Defendant and Dynamix referenced the applicability of Defendant's terms and conditions.

(*See generally* Sept. 21–Oct. 4, 2018 Correspondence; Oct. 5–Dec. 17, 2018 Correspondence; *see

also* Def.'s Facts ¶ 33).  Yet, the parties dispute which terms and conditions are binding with

respect to this suit.

Although interpretation of a contract is a question of law, "which documents comprise the

contract is a question of fact[;] and if the parties disagree on this point, summary judgment is not

appropriate."  *CC-Aventura, Inc. v. The Weitz Co.*, LLC, No. 06-21598-Civ, 2009 WL 2132706,

at *2 (S.D. Fla. July 14, 2009) (alteration added; citing *Impossible Elec. Techniques, Inc. v.

Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031–32 (5th Cir. 1982) and *Aetna Ins. Co. v.

State Farm Fire & Cas. Co.*, 457 So. 2d 512, 513 (Fla. 1st DCA 1984)).  Defendant contends

"Plaintiff cannot dispute the applicability of the [T]erms and [C]onditions to the subject

transaction." (Mot. 12 (alterations added)).  Plaintiff disagrees, offering four alternative terms and conditions and insisting there is a genuine issue of fact regarding which of Defendant's terms and conditions govern this case.  (*See* Opp'n 12–15; Pl.'s Facts ¶¶ 94–97).

As an initial matter, Defendant's arguments for the applicability of its proffered Terms and Conditions are unpersuasive.  Defendant points out that Plaintiff makes multiple references to the Terms and Conditions in its SAC and consented to transfer to this District under the Terms and Conditions.  (*See* Mot. 12–13).  While Plaintiff mentions Defendant's obligations under its terms and conditions (*see* SAC ¶¶ 8, 15), it is not clear from these allegations that Plaintiff meant to refer to Defendant's proffered Terms and Conditions.  As stated, Plaintiff agrees that Defendant's terms and conditions apply but disagrees which version applies.

It is true that Plaintiff relied in part on Defendant's forum selection clause to allege proper venue in the SAC (*see id.* ¶ 2 ("Venue is proper in the United States District Court for the Southern District of Florida pursuant to the Defendant's Forum Selection Clause and [because] some of the acts giving rise to the lawsuit occurred here." (alteration added))); and Defendant asserts "[h]aving brought suit in this forum pursuant to the terms of the contract, [P]laintiff is bound by all the terms of the contract on which it sues" (Mot. 12 (alterations added; citing *Anchor Seafood, Inc. v. CMA-CGB (Caribbean), Inc.*, No. 05-23097-Civ, 2005 WL 4674292, at *2 (S.D. Fla. May 4, 2005))).  *Anchor Seafood* is off point.  In that case, the court stated: "[W]here, as here, a consignee brings an action not against its vendor but against the vendor's carrier, arguing in effect that the consignee is a third party beneficiary of the contract between the vendor and the carrier, the consignee is bound by all the terms of the contract on which it sues."  2005 WL 4674292, at *2 (alteration added; footnote call number and citations omitted).

The dispute in this case is not analogous.  Plaintiff has not brought this action under — and

does not argue it is a third-party beneficiary of — Defendant's terms and conditions.  Even though Plaintiff's reliance on the forum selection clause in the SAC lends credence to Defendant's contention that the $50 liability limitation also applies,[7] Defendant fails to persuade that this means there is not a genuine dispute of fact.

Defendant also argues the Terms and Conditions became binding through a course of dealing between Defendant and DGF Chile.  (*See* Mot. 13–14).  But even assuming they did,[8] Defendant does not explain why this means the Terms and Conditions became binding on International Brand Development, especially where it is Defendant's position that Tottus (not International Brand Development) was invoiced for both the inland and ocean transportation (*see* Gorman Decl. ¶¶ 11–12, 14; *id.*, DHL Invoice 8) and there is no indication on the record that Defendant and International Brand Development entered into an explicit agreement.  Furthermore, Plaintiff disputes whether the Terms and Conditions were even contained in the invoice to DGF Chile, as the invoice is "page 1 of 1" and states "[a]ll and any business undertaken, including any advice, information or service provided, whether gratuitously or not is transacted subject to the standard conditions for the time being in force, a copy of which will be supplied on request."  (Pl.'s

---

[7] Of Plaintiff's proffered terms and conditions, only the fourth — the DHL Global Forwarding Terms and Conditions of U.S. Domestic Carriage — contain a similar forum selection clause requiring any claims arising from the agreement to be "brought exclusively in the state or federal courts serving the state of Florida."  (DHL Global Forwarding Terms and Conditions of U.S. Domestic Carriage 7 (capitalization omitted)).  But if these terms and conditions applied, they would also impose a $50-per-shipment liability limitation to Plaintiff's negligence claim.  (*See id.* 5; *see also* Reply 9).

[8] The Court notes that while Defendant asserts it routinely sends invoices along with the Terms and Conditions to DGF Chile and DGF Chile "agreed to be bound by the [T]erms and [C]onditions and never objected to same" (Mot. 14 (alterations added)), it is not clear that the Terms and Conditions became part of the contractual relationship between Defendant and DGF Chile.  *See Premix-Marbletite Mfg. Corp. v. SKW Chemicals, Inc.*, 145 F. Supp. 2d 1348, 1356 (S.D. Fla. 2001) ("Terms and conditions contained in a form continually sent by one party do not constitute performance and cannot becom[e] binding as a course of dealing." (alteration added; citations omitted)).

Facts ¶ 37 (alteration added); *see also* Gorman Decl, DHL Invoice 8).

Plaintiff presents its four terms and conditions to demonstrate there is a factual issue precluding summary judgment.  (*See* Opp'n 12–15; Pl.'s Facts ¶¶ 94–97).  Defendant disputes each one in some form:

- The DHL Global Forwarding Terms & Conditions: Defendant does not dispute that this exhibit "is an unauthenticated document entitled 'DHL Global Forwarding Terms & Conditions (valid as of October 11, 2019)[']" but that date "is nearly a year after the subject transaction took place."  (Def.'s Resp. Facts ¶ 94 (alteration added); *see also* Reply 8).

- The Danmar Lines Bill of Lading Terms and Conditions: Defendant disputes this exhibit because the document is "incredibly blurry and unintelligible" (Def.'s Resp. Facts ¶ 95) and Danmar Lines, Defendant's in-house carrier, "had nothing to do with this transaction at all" (Reply 8–9).

- The DHL Global Forwarding Standard Trading Conditions: Defendant states this set of terms and conditions is unauthenticated and incomplete.  (*See* Def.'s Resp. Facts ¶ 96; Reply 9).

- The DHL Global Forwarding Terms and Conditions of U.S. Domestic Carriage.  Defendant disputes that this document applies to the transaction (*see* Def.'s Resp. Facts ¶ 97) because, by its terms, it only applies to shipments destined to be delivered in the United States (*see* Reply 9).  Defendant notes these terms and conditions also provide a liability limitation of $50 per shipment in any event.  (*See id.*).

Viewed in the light most favorable to Plaintiff, at least the third set of terms and conditions creates an issue of fact.  The DHL Global Forwarding Standard Trading Conditions limit Defendant's liability for negligence to "a sum at the rate of two SDRs per kilo of gross weight of any Goods lost or damaged . . . ."  (DHL 4 Global Forwarding Standard Trading Conditions (alteration added)).  Plaintiff explains that this calculation would produce a liability limitation of $14,376.70 for the loss, rather than $50.  (*See* Opp'n 13).

Thus, at the summary-judgment stage, the Court cannot determine which set of terms and

CASE NO. 20-22065-CIV-ALTONAGA/Goodman

conditions applies and therefore whether or how Defendant's liability should be limited.

## IV.    CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant, Danzas Corporation d/b/a DHL Global

Forwarding's Motion for Summary Judgment **[ECF No. 51]** is **GRANTED in part** as follows:

1. Summary judgment is granted on Count I.

2. The case will proceed to a bench trial on Count II during the February 1, 2021 two-
   week trial period, in accordance with the Order Setting Bench Trial and Pre-Trial
   Schedule [ECF No. 36].

3. The parties shall submit a joint pre-trial stipulation and proposed findings of fact and
   conclusions of law by **January 7, 2021**, as provided in the Court's December 17, 2020
   Order [ECF No. 62].  **In those submissions, the parties shall clarify the basis for the
   Court's subject matter jurisdiction over the remaining claim, given the Court's
   conclusions in this Order.**

**DONE AND ORDERED** in Miami, Florida, this 22nd day of December, 2020.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

27